GORMAN'S, INC., et al., (Plaintiff) Appellant,

v.

COMMERCE TRUST COMPANY et al., (Defendants) Respondents.

No. 52305.

Supreme Court of Missouri, Division No. 1.

March 13, 1967.

Motion for Rehearing or to Transfer to Court En Banc Denied April 10, 1967.

Lowell L. Knipmeyer, Glenn E. McCann, Joseph H. Moore, Kansas City, Knipmeyer, McCann & Millett, Kansas City, of counsel, for appellant.

David Skeer, Kansas City, Sheffrey, Ryder & Skeer, Kansas City, of counsel, for respondents.

HOLMAN, Presiding Judge.

This action was instituted by plaintiff in an effort to recover damages in the sum of $200,000 for the alleged breach of a lease by defendants. Defendants as trustees of a trust estate owned an eight-story building located at 12th and Grand Avenue in Kansas City, Missouri, which was leased to plaintiff in 1954 for a period of fifteen years. The building was destroyed by fire on July 4, 1960. In this suit plaintiff alleges that defendants failed to insure certain improvements made by it to the premises as required by the lease and therefore it has been damaged to the extent of the cost of such improvements. A trial resulted in a verdict for defendants. Plaintiff has appealed.

In 1954, the defendants' building was occupied by Davidson Furniture Company and the lease was about to expire. The building was being managed by Guignon Real Estate Company, primarily under the supervision of Mr. Schmelzer. After being contacted by Mr. Guignon, Mr. Sam Gorman, the president of plaintiff during all the time here involved, became interested in leasing the property. It was agreed between the parties that the building was badly in need of a complete renovation and remodeling. After some negotiations, plaintiff and defendants entered into a lease in February 1954. Therein, it was agreed that plaintiff would lease the building for a period of fifteen years commencing on September 1, 1954, or on the first day of the month thereafter following the completion of improvements, at a rental of $2,500 per month (apparently occupancy commenced November 1). There was a provision for additional contingent percentage rent for any year in which the sales of plaintiff in the premises exceeded $1,000,000. As to the improvements the lease contained, in part, the following:

"Lessor and Lessee agree that alterations and improvements to the premises in an amount of approximately One Hundred Fifty Thousand Dollars ($150,000) are indicated to obtain maximum volume of sales and rent from the leased premises. Lessor agrees to make available the sum of One Hundred Thousand Dol-

lars ($100,000) for this purpose as soon as the leased premises are vacated by the present tenant. Lessee agrees to advance to Lessor an additional sum up to Fifty Thousand Dollars ($50,000) for said alterations and improvements. Said sums are to be expended for work, labor and material, including architect's fees for any and all alterations and improvements, excepting merchandise, fixtures and floor coverings."

It was also provided that lessee could obtain reimbursement for money expended, not to exceed $50,000, for improvements on the premises, by crediting one half of any contingent excess rental required to be paid under the terms of the lease upon the said $50,000 so expended. The lessee was given the right to make additional expenditures for improvements in excess of the $150,000 heretofore mentioned but was limited in the reimbursement provision to $50,000.

The lease further provided that if the building were destroyed by fire the lessor would rebuild it—such rebuilding to commence within 60 days and to be completed within 9 months following the date of destruction, except for delays occasioned by "fire, strikes and all other hazards over which the lessor has no control."

The Article of the lease relating to insurance is the one primarily involved in this case. It reads as follows:

"Lessor covenants to keep buildings and improvements at any time upon the leased premises insured at Lessor's own expense against loss by fire, tornado, windstorm, aircraft and explosion in a sum not less than the replacement cost thereof, if obtainable, except that Lessee shall pay all increased cost of insurance, if any, resulting from the making by it of any addition, alterations, changes, improvements or remodeling in or on the buildings on said premises. All insurance policies for such insurance shall be in companies authorized and licensed to do business in the State of Missouri,

or if in other companies, such as shall receive the written approval of the Lessee."

The remodeling program began in June 1954 and was substantially completed by November of that year, although additional work continued for some time thereafter. The remodeling work was done by C. P. Hucke Construction Company upon the recommendation of Mr. Schmelzer. The company foreman, Mr. Alexander, testified that he followed suggestions from both Mr. Schmelzer and Mr. Gorman. Mr. Schmelzer paid very close attention to the work until $100,000 had been expended. After that he visited the project occasionally to see that "things were in order." There was testimony of a general nature indicating that the entire remodeling project cost approximately $270,000, of which plaintiff paid $170,000.

In regard to the insurance on the improvements Mr. Schmelzer testified on behalf of defendants that in August 1954 he asked Sam Gorman for an accounting as to the amount of money plaintiff was spending on the improvements; that Gorman replied that he did not have that information but that it would be supplied as soon as it was prepared; that he, Schmelzer, on September 9, obtained a 30-day binder for $100,000 to cover the improvements made by defendants; that that binder was extended for another 30 days on October 9, and again on November 9, at which time he was told that the insurance company would not issue another binder and that he would have to get a permanent policy by December 9; that shortly before December 9 he talked with Sam Gorman and again asked for the amount of plaintiff's improvements so that a policy could be written covering the amount of both plaintiff's and defendants' expenditures; that at that time Gorman told him that he couldn't furnish the figures and that defendants could go ahead and get a policy to protect their interest and that he, Gorman, would take out a binder to protect the improvements plaintiff had paid for. Gorman, in his testimony, stated

that he had no recollection of any of those conversations with Schmelzer. However, both Gorman and Schmelzer agree that Gorman did not submit to Schmelzer, or any of the defendants, the amount of the cost of improvements paid for by plaintiff. Also, plaintiff did not pay any insurance premiums to defendants. While there is no specific evidence of any binder obtained by plaintiff, there was testimony that plaintiff obtained a policy of insurance on October 1, 1955, which insured its improvements and betterments on the building in question; that this policy was in force three years, at the end of which time plaintiff apparently discontinued any insurance on that item.

While there is some evidence to the contrary, it appears rather clear that plaintiff had no insurance on the improvements at the time of the fire and did not receive any sum from any insurance company to cover its improvement expenditures.

Sam Gorman testified that he did not advise Schmelzer as to plaintiff's expenditures because Schmelzer gave close attention to the job and had all of the information he had as to the cost of the work; that the first year of operation was the only year that the sales were more than $1,000,000 and that resulted from an extensive advertising program designed to establish the new business; that as the result of the first year's business plaintiff paid excess rental and obtained a credit of $1,200 on its improvement expenditures. Mr. Gorman further stated that the building proved to be an unprofitable retail location and plaintiff ceased operation in the building in October 1957 but continued to pay rent as required by the lease. In the spring of 1958, with the approval of defendants, plaintiff sublet the premises to E.C.O., a discount house, at the same rental and under substantially the same terms as the original lease. As a part of the agreement concerning the sublease it was agreed, however, that the provision for excess contingent rent would be deleted from the lease, and in consideration of that agreement plaintiff agreed to waive any right to reimbursement for the remainder of the $50,000 expended for improvements which was to be obtained by crediting one half of the excess rental to that item. Plaintiff did retain possession of one and one-half floors of the building under an agreement with E.C.O. by which it operated the furniture department of E.C.O.

Mr. Gorman also testified that after the building was destroyed by fire and explosion on July 4, 1960, plaintiff collected insurance on the loss of its furniture and fixtures but nothing for the improvements to the building; that shortly thereafter he met with Mr. Schmelzer and other representatives of the defendants to discuss the possible reconstruction of the building; that at that meeting it was generally agreed that the cost of rebuilding would be approximately $1,000,000. He stated that defendants did not want to rebuild and that he told them that he did not want the building rebuilt; that he realized that if the building were reconstructed the rental provided for in the lease would start again; that after that meeting the building was razed and the land was thereafter used as a parking lot.

On behalf of the defendants, Harvey Schmelzer testified that after the fire Sam Gorman came to his office and stated that unfortunately he had cancelled his insurance on improvements; that he did not want the building rebuilt because he doubted that his subtenant was in a position to carry out the terms of the lease and he did not want the financial obligation of the lease put back on him; that later, in a meeting between Mr. Gorman and his attorney, at which other representatives of defendants were present, Mr. Gorman stated that "under no conditions did he want the building rebuilt and he would write us a letter to that effect"; that the trustees received insurance on the premises to the extent of $354,000 and were willing to rebuild if such were desired by plaintiff.

In regard to the insurance on the improvements this witness stated that he knew

plaintiff had carried such insurance because he had seen the charges for the premiums. On cross-examination he stated that he did not know how much money plaintiff had expended on the improvements but when pressed for an estimate he stated he would say around $75,000 to $100,000.

There was considerable testimony on the question as to whether or not replacement cost insurance could be obtained in Missouri and, if so, whether any amount is payable thereunder until and unless the insured property is actually rebuilt. On behalf of plaintiff, James P. Rusconi, assistant vice-president of the agency which carried plaintiff's insurance during the times in question, testified that either the landlord or tenant could obtain replacement insurance for improvements which could be collected without requiring reconstruction of the building. He said that such was written by Federal Insurance Company. The defendants, however, presented Stanley S. Cox, manager of the fire insurance department of the Thomas McGee Agency, who identified certain printed forms used in the writing of replacement cost insurance and stated that those forms were used by Federal Insurance Company. He pointed out that those forms provided that no loss was payable unless and until the destroyed property is actually rebuilt. He stated that he knew of no company which would write insurance on a replacement cost basis which would provide for payment unless the property is rebuilt.

Defendants took the position at the trial that plaintiff never advised them as to the amount it expended on improvements and hence they could not insure that item; that the insurance provision in the lease was waived as to plaintiff's improvements when plaintiff agreed to procure its own insurance therefor and the plaintiff was not entitled to recover because the only purpose of the insurance was to provide money for rebuilding and plaintiff admittedly did not want it rebuilt. Plaintiff contended that the lease did not require it to give cost information to defendants and therefore it was not required to do so; that defendants had information from other sources as to the cost of the improvements; that defendants were bound in every event to provide the insurance on plaintiff's improvements; that defendants are precluded by the Statute of Frauds from showing the alleged agreement by Sam Gorman for plaintiff to provide its own insurance.

Upon this appeal plaintiff contends that it is entitled to a new trial because of errors of the trial court in the giving and refusal of instructions and in the admission of incompetent evidence. We need not discuss any of those contentions because we have concluded that plaintiff is not entitled to recover and hence that the court should have sustained defendants' motion for a directed verdict.

In order to reach a decision herein we deem it necessary to construe Article XI in the light of the existing circumstances and the objectives the parties intended to accomplish thereby. At the time of the negotiations everyone apparently agreed that the building needed extensive repairs and improvements, including air conditioning. Defendants were willing to spend $100,000 and to give plaintiff credit for an additional $50,000, providing the excess contingent rental were sufficient. Sam Gorman said it was anticipated that the cost would be $200,000. Actually, it totaled about $270,000. It would appear that plaintiff was willing to advance $50,000 contingently, and to pay absolutely the excess over $150,000 in order to have a more satisfactory place in which to conduct its business for 15 years. There was no way provided in the agreement for it to get any other benefit out of that expenditure. This leads us to the question as to why plaintiff was interested in requiring defendants to carry insurance on the building. It seems apparent to us that plaintiff required insurance equal to replacement cost so that it would be assured that defendants would have the financial ability to rebuild (according to their agreement) in the event

the building was destroyed. In that situation plaintiff could be reasonably certain of having the use of the building as improved (or new, if destroyed) for the full 15-year term.

As we view Article XI, the provision that "lessee shall pay all increased cost of insurance, if any, resulting from the making by it of any addition, alterations, changes, improvements or remodeling in or on the buildings on said premises" was for the sole benefit of defendants. The improvements and additions increased the replacement cost, thus requiring more insurance, and, since a portion of the improvements were made by plaintiff for its benefit, it apparently was considered equitable that plaintiff should pay the proportionate share of the premiums for the added insurance. The fact that the parties may have later modified that provision would not change the construction we would place upon the provision itself, considering also the circumstances at the time the lease was executed. Plaintiff is not relying on that modification but, on the contrary, is contending that evidence thereof should have been excluded.

It should be noted that there was no provision in Article XI for the payment of any insurance proceeds to plaintiff. That was not the purpose of the insurance. If the purpose of the provision had been to require defendants to insure plaintiff's improvements, at plaintiff's expense, and, in the event of loss to pay the amount received to plaintiff, there would have been no occasion for placing the provision in the lease. If that had been the purpose it would have been much simpler, and more reasonable, for plaintiff to have carried its own insurance on its improvements and thus to have protected itself against loss (as it did for three years).

In summary, we construe Article XI as requiring insurance for the purpose of making it reasonably certain that defendants would have the funds with which to carry out its agreement to rebuild the building in the event of destruction, with plaintiff being required to pay a proportionate part of the added premiums caused by additions and improvements made by it.

It is admitted that plaintiff did not want the building rebuilt. That is certainly understandable as it had everything to lose and nothing to gain by the rebuilding and thus the continuation of the lease. Plaintiff had found the location unprofitable for its business. So long as E.C.O. continued to operate plaintiff made no profit from the lease, but if the sublessee failed at any time to pay the rent plaintiff would have had to start paying it. Obviously, E.C.O. desired to continue in business at that location as it brought a suit against Gorman's and the trustees (defendants herein) in which, in part, it unsuccessfully sought specific performance of the agreement to rebuild. See Employees Consumer Organization, Inc. v. Gorman's, Inc., Mo.Sup., 395 S.W.2d 162. While there might have been some advantage in having a new building, it is obvious that Mr. Gorman thought it was a bad location and did not want the lease to continue under any circumstances.

Since, under the lease provision, no money from an insurance loss was to have been paid to plaintiff, and, since plaintiff did not desire that the building be rebuilt, we hold that plaintiff was not damaged by any failure of defendants to carry additional insurance to cover the amount expended by it for additions and improvements to the building. It follows from the foregoing that plaintiff could not recover damages in this action and therefore that the court should have sustained the motion for a directed verdict.

The judgment for defendants is accordingly affirmed.

HENLEY and SEILER, JJ., and KIMBERLIN, Special Judge, concur.